BROWN, Circuit Judge,
dissenting in part:
For more than a decade, this circuit has offered a wary allegiance to the imminence standard, first articulated in Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C.Cir.1997). Today’s opinion labors to extend that line of cases, barring preenforcement claims for declaratory relief unless the plaintiff can show a threat of imminent prosecution, and thus denying access to Article III courts to District of Columbia litigants seeking vindication of civil rights claims-access they would have under applicable Supreme Court precedent. Whether Ord’s allegations meet Navegan’s, stringent standard is a close question, but this controversy demonstrates why litigants should not be required to jump through such hoops to get past the courthouse door. Consequently, while I agree Ord has standing to bring his claim for damages under 42 U.S.C. § 1983, and agree his claims are not so insubstantial as to deprive the federal courts of jurisdiction over them, I do not think we can or should strain to fit this case within Navegan’s standard based on the government’s belated concession. I do think the en banc court can and should rehear this appeal sua sponte and overrule Navegar.
According to Ord’s complaint and affidavit, his security firm, Falken Industries, is licensed by the Metropolitan Police Department (MPD). Aff. ¶ 10. Using information Ord voluntarily provided to the MPD, the MPD and the D.C. Office of the Attorney General (OAG) arrested and jailed Ord’s employees in D.C. and obtained a warrant for Ord’s arrest. Compl. ¶ 19; Aff. ¶¶ 16-18, 20. MPD officers used the ruse of asking Ord to pick up his *1147 employee’s vehicle to try to lure him back into D.C. Aff. ¶ 19. When that failed, they staked out Falken’s Virginia office. Id. ¶1124, 26. Ord had also seen a memorandum the MPD sent to its Reserve Corps Members warning them that Special Conservators of the Peace who were not government “employee[s]” under the Law Enforcement Officers Safety Act of 2004 (LEOSA), 18 U.S.C. § 926B(c), would be subject to all relevant criminal penalties for violating D.C.’s firearms laws. Compl. ¶ 18. Thus, Ord effectively was exiled from D.C. by his fear of being prosecuted if he ever returned. Aff. ¶ 30.
Under Supreme Court doctrine, these facts would be more than sufficient to establish Ord’s standing under Article III to bring a claim under the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201. As the Supreme Court repeatedly has confirmed, “where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.... The plaintiffs own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but ... does not eliminate Article III jurisdiction.” Medlmmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128-29, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) (emphasis omitted). Thus, the District’s decision to declare a nolle prosequi, and thereby to eliminate the threat of imminent prosecution, would be no impediment to Ord’s standing under Supreme Court standards. Navegar turns this easy case into a close call; and worse, it makes Ord’s access to federal court depend on the government’s litigation strategy.
There are, of course, sensible constraints on litigants’ access to federal courts. Even in suits seeking declaratory or injunctive relief, federal courts have jurisdiction only if there exists an actual case or controversy. U.S. Const, art. Ill, § 2. These “constitutional boundaries” are “measure[d] through the application of standing, mootness, and ripeness doctrines.” Worth v. Jackson, 451 F.3d 854, 857 (D.C.Cir.2006). The doctrine at issue here, standing, requires the plaintiff to establish an injury-in-fact that is fairly traceable to the challenged conduct and that will likely be redressed by a favorable decision on the merits. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The injury, in turn, must be “distinct and palpable,” not “abstract,” “conjectural,” or “hypothetical.” Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (internal quotation marks omitted). And even when these constitutional criteria are met, standing may be denied on prudential grounds where, for example, the plaintiff seeks to raise another person’s legal rights or seeks to adjudicate a mere generalized grievance. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). These limitations ensure federal courts are not “ ‘called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.’ ” Id. (quoting Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). But these limitations do not exist to give law enforcement agencies carte blanche to violate individual rights.
There is nothing unique about suits brought under the DJA that requires a special jurisdictional analysis. See Franchise Tax Bd. of California v. Constr. Laborers Vacation Trust, 463 U.S. 1, 17, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (DJA “was intended to affect only the remedies available in a federal district court, not the *1148 court’s jurisdiction”). As the Supreme Court has long made clear, if a plaintiff has been placed “between the Seylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding,” he has suffered an injury sufficient to establish standing to seek declaratory relief without “first exposing] himself to actual arrest or prosecution.” Steffel v. Thompson, 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). All that is required is that the threat of prosecution be “credible” — as it would be with any regularly enforced statute — rather than “imaginary or speculative” as would be the case if a statute were obsolete and never enforced. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (internal quotation marks omitted).
Although Navegar purported to rely on the standard articulated in United Farm Workers, it actually grafted an imminence requirement onto the credible threat standard seemingly from whole cloth. See Navegar, 103 F.3d at 998 (citing United Farm Workers, 442 U.S. at 298-99, 99 S.Ct. 2301, but referring to a “threat of prosecution ... which is credible and immediate ” and a “credible threat of imminent prosecution” (emphasis added)). Of course, United Farm Workers and Nave-gar are distinguishable but those differences do not account for Navegaras divergence. United Farm Workers was the product of a lengthy evolution. The Supreme Court’s doctrine began to take shape in Poe v. Ullman, 367 U.S. 497, 509, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (plurality), where the Court denied standing to plaintiffs seeking a declaration that a state law, which prohibited contraceptives but had not been enforced in decades, was unconstitutional. The Court explained, “the mere existence of a state penal statute ... constitute^] insufficient grounds to support a federal court’s adjudication of its constitutionality ... if real threat of enforcement is wanting.” Id. at 507, 81 S.Ct. 1752.
The Court reached the opposite result in Doe v. Bolton, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), holding physicians had standing to challenge a criminal abortion statute even though none of them had “been prosecuted, or threatened with prosecution, for violation” of the law. Unlike the obsolete statute in Poe, here the statute was “recent and not moribund.” Doe, 410 U.S. at 188, 93 S.Ct. 739. Finding the statute, if enforced, would “directly operate” against the plaintiffs, the Court held they could sue immediately rather than waiting for “a criminal prosecution as the sole means of seeking relief.” Id. The statute’s mere existence constituted “a sufficiently direct threat of personal detriment.” Id.
The following year, in Steffel, the Court held a plaintiff who wished to distribute handbills protesting American involvement in Vietnam had standing to seek a declaration that the state law prohibiting such conduct was unconstitutional. 415 U.S. at 459, 94 S.Ct. 1209. Because the plaintiff had been told by police that continuing to ignore their warnings would likely lead to prosecution, the plaintiffs fears were not “imaginary or speculative.” Id. (internal quotation marks omitted). Thus, it was “not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.” Id. at 459, 94 S.Ct. 1209.
These principles coalesced in United Farm Workers where the Court held plaintiffs have preenforcement standing when they have “alleged an intention to *1149 engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.” 442 U.S. at 298, 99 S.Ct. 2301. The Court held the plaintiffs had standing to challenge a state criminal law prohibiting certain union practices because, although the “criminal penalty provision ha[d] not yet been applied,” “the State ha[d] not disavowed any intention of invoking the ... provision against unions that commit unfair labor practices.” Id. at 302, 99 S.Ct. 2301.
Clearly, Navegar's imminence requirement is not derived from United Farm Workers. Instead, its language seems to echo the injury-in-fact element of standing — requiring “an invasion of a legally protected interest that is ... ‘actual or imminent.’ ” Navegar, 103 F.3d at 998 (quoting Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130). As the Navegar court perceived the axis between injury and enforcement, the terms are near synonyms. That may be because standing and ripeness tend to merge in preenforcement challenges to criminal statutes. Perhaps, then, the Navegar court believed that if a plaintiff seeking to challenge a criminal statute does not face an “actual” prosecution, he must at least face an “imminent” one. However, by erroneously conflating a plaintiffs injury and the government’s prosecution, Navegar ignored the injurious effect of the mere existence of a regularly enforced statute that prohibits conduct a plaintiff believes is protected. Requiring a threat of imminent prosecution also ignores the injurious effect of other types of government coercion, such as harassment and intimidation. The Supreme Court has repeatedly made clear the DJA was designed to provide relief in precisely such circumstances. See, e.g., Steffel, 415 U.S. at 462-63, 94 S.Ct. 1209. Standing exists because the plaintiffs abstention is itself an actual injury, regardless of whether a prosecution is imminent. See Poe, 367 U.S. at 508, 81 S.Ct. 1752 (noting that a plaintiff has preenforcement standing when his “compliance with the[] statutes is [ jcoerced by the risk of their enforcement”).
In the decade since it was decided, we have repeatedly expressed grave misgivings about Navegar. We have noted that Navegar's analysis is in “sharp tension with standard rules governing preenforcement challenges to agency regulations” and freely admit it is contrary to our cases “upholding preenforcement review of First Amendment challenges to criminal statutes.” Seegars v. Gonzales, 396 F.3d 1248, 1253-54 (D.C.Cir.2005). We have said (and the court says again today) Navegar appears to demand more than the credible threat the Supreme Court found sufficient in United Farm Workers. See Parker v. District of Columbia, 478 F.3d 370, 375 (D.C.Cir.2007), aff'd in part sub nom. District of Columbia v. Heller, — U.S. -, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); Op. at 1140-41. In Parker, we were even more forthright, noting the Supreme Court’s decision in Virginia v. American Booksellers Ass’n, 484 U.S. 383, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988), “held it sufficient for plaintiffs to allege ‘an actual and well-founded fear that the law will be enforced against them,’ ... without any additional requirement that the challenged statute single out particular plaintiffs by name.” Parker, 478 F.3d at 375 (quoting Am. Booksellers, 484 U.S. at 393, 108 S.Ct. 636 (internal citation and footnote omitted)). We noted: “In both United Farm Workers and American Booksellers, the Supreme Court took a far more relaxed stance on pre-enforcement challenges than Navegar and Seegars permit.” Id.
Medlmmune can now be added to the list of Supreme Court cases conflicting *1150 with Navegar. Navegar reasons that “a credible threat of imminent prosecution can injure the threatened party by putting her between a rock and a hard placet:] ... either forego possibly lawful activity because of her well-founded fear of prosecution, or willfully violate the statute.” Navegar, 103 F.3d at 998. But Medlmmune makes clear that this dilemma exists even before the threatened prosecution becomes imminent. A plaintiff may “eliminate[] the imminent threat of harm by simply not doing what he claimed the right to do,” but will still have preenforcement standing “because the threat-eliminating behavior was effectively coerced.” Med-Immune, 549 U.S. at 129, 127 S.Ct. 764. Indeed, “[t]he dilemma posed by that coercion — putting the challenger to the choice between abandoning his rights or risking prosecution — is ‘a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate. ” Id. (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Thus, failing to violate the statute, or, as in this case, convincing the government to suspend its enforcement action, eliminates the imminent threat but not Article III jurisdiction.
Navegar's conflict with Supreme Court doctrine notwithstanding, the court strains — unpersuasively in my view — to fit this case within its standard. The court bases its conclusion that “Ord’s allegations support his standing under Nave-gar” on the District’s “concession” that “ ‘Ord’s allegations that the District applied for an arrest warrant against him [are] sufficient to show ... a special priority.’ ” Op. at 1142 (quoting Appellee’s Br. 24) (alterations in original). But, by issuing a warrant, arresting Ord’s employees, and following Ord to another jurisdiction, the authorities already had passed that threshold. The concession adds nothing.
Navegar speaks of requiring a “credible threat of imminent prosecution,” not merely a showing that the authorities have placed a special priority on enforcing the law against the plaintiff. 103 F.3d at 998. True, in Parker and Seegars, we emphasized that the plaintiffs had not been singled out for prosecution and relied on that fact to hold their allegations of standing insufficient under Navegar. See Parker, 478 F.3d at 375; Seegars, 396 F.3d at 1255-56. But while this means it is necessary to show special targeting to establish standing under Navegar, it does not necessarily mean such a showing is sufficient. Indeed, the district court reasonably read Navegar to demand special targeting plus imminence, and noted that once the warrant was nullified, there was no longer “ ‘a threat of prosecution reaching the level of imminence required by Navegar.’ ” Ord v. District of Columbia, 573 F.Supp.2d 88, 95 (D.D.C.2008) (quoting Seegars, 396 F.3d at 1255). By contrast, the court concludes that plaintiffs meet the Navegar “credible and imminent” standard by demonstrating that “their prosecution results from a special law enforcement priority, namely that they have been ‘singled out or uniquely targeted by the ... government for prosecution.’ ” Op. at 1140-41 (quoting Parker, 478 F.3d at 375 (alteration in original)).
NavegaPs analysis began with an observation: “whether a threat of prosecution adequate to satisfy the requirements of justiciability is present in any particular preenforcement challenge is a factual and case-specific” determination, requiring courts to “look to a variety of factors.” 103 F.3d at 999. The court then explained, “[t]he most important circumstance ... [here] is that the Act in effect singles out the appellants as its intended targets.” Id. at 1000. Thus, the fact that the plaintiffs had been “single[d] out” was simply one factor, albeit a significant one. See also id. at 1001 (noting, with respect to *1151 the second part of the statute, that “[i]n the absence of this factor, the threat of prosecution becomes far less imminent”). The court proceeded to uphold the plaintiffs’ standing by examining the unique factual circumstances and drawing a connection between the targeting in the statute and the existence of a threat of imminent prosecution. See id. at 1000-01. It was the whole constellation of events — the specificity of the statute, the agents’ visits to the manufacturing facility, and the ongoing “pro-enforcement activities”' — that convinced the court the government would not “sit idly by” if the statute was violated. Id. at 1000. But what if the government had pledged to sit idly by?
Here, it is obvious — even without the District’s “concession” — that the MPD has, in some sense, “targeted” or “singled out” Ord by obtaining a warrant for his arrest. But it does not follow that Ord faces a threat of imminent prosecution. The court finds that the District’s “concession signals that it expects to prosecute [Ord] in the future.” Op. at 1142. Even assuming this is a valid inference, an expectation of future prosecution is not even remotely the same as a threat of imminent prosecution. Ord currently is abstaining from reentering D.C. with a firearm. See Aff. ¶ 30. Of course, the court is correct in finding that Ord has alleged a desire to reenter D.C. with his firearm, see Op. at 1143, and no doubt he would do so if he did not fear that a criminal prosecution would result. But we cannot say here, as we said in Navegar, that “if these provisions of the statute are enforced at all, they will be enforced against th[is] appellant[ ].” 103 F.3d at 1000. Under the status quo, not only does Ord not face a threat of imminent prosecution, but in light of the nolle prosequi and his decision to avoid reentering D.C. with a firearm, he faces a certainty of no prosecution. Is it absurd that Ord lacks standing to challenge a law merely because the prosecutors decided at the last moment to nullify the warrant for his arrest? Yes, but such is the result of our doctrine.
The court attempts to rehabilitate Nave-gar by asserting that, because Ord’s “injury is imminent,” he has satisfied the Nave-gar standard. Op. at 1143. I accept the premise, but not the conclusion. If an imminent injury were all Navegar required, it would be on all fours with Supreme Court doctrine. See Lujan, 504 U.S. at 560, 112 S.Ct. 2130 (injury-in-fact must be “actual or imminent”). Instead, Navegar requires a threat of imminent prosecution. 103 F.3d at 998. Thus, while Ord’s “inability to travel to D.C. and carry on his security business here while armed without fear of prosecution,” Op. at 1143, would establish his injury-in-fact under Supreme Court standards, it is beside the point under Navegar. Only by redefining the word “imminent” beyond recognition is the court able to conclude that Ord faces a threat of imminent prosecution. While the court’s willingness to read “imminence” out of our precedents on a case-by-case basis may occasionally benefit plaintiffs whose standing would be indisputable under Supreme Court standards, such an ad hoc approach provides no guidance to lower courts and no certainty to litigants.[1]
*1152 Not only does Navegar conflict with Supreme Court doctrine, but our reliance on it has anomalous and injurious practical consequences. A prosecution is unlikely to be imminent if individuals i’efrain from violating the law out of fear of prosecution. Yet, even under the court’s reading of Navegar, individuals only have preenforcement standing if they come close enough to violating the law to become “singled out” or “uniquely targeted” by law enforcement. See Op. at 1140-41. And if they do violate the law, declaratory relief in federal court becomes unavailable as soon as the government initiates a prosecution. See Younger v. Harris, 401 U.S. 37, 40-41, 91 S.Ct. 746 27 L.Ed.2d 669 (1971); see also Samuels v. Mackell, 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (extending Younger to declaratory relief); JMM Corp. v. District of Columbia, 378 F.3d 1117, 1125 (D.C.Cir.2004) (treating D.C. as a state for purposes of Younger abstention). However, as the Supreme Court has made clear, the DJA was designed to provide “ ‘an alternative to pursuit of the arguably illegal activity.’ ” Medlmmune, 549 U.S. at 129, 127 S.Ct. 764 (quoting Steffel, 415 U.S. at 480, 94 S.Ct. 1209 (Rehnquist, J., concurring)). Navegar essentially nullifies this Congressional intent.
An even more pernicious effect of Nave-gar’s imminence requirement is that it places access to preenforcement relief entirely in the hands of the government. As the court below explained, “[a]t first glance,” the fact that the MPD obtained a warrant for Ord’s arrest “seems to establish that the threat of prosecution against Ord is not imaginary or speculative.” Ord, 573 F.Supp.2d at 94 (internal quotation marks omitted). However, the district court correctly found that after “the Office of the Attorney General declared a nolle prosequi of the Information in support of the warrant,” the warrant ceased to have effect and the threat of prosecution ceased to be imminent. Id. at 94-95. In effect, Navegar’s imminence requirement gave the government a “pocket veto” over Ord’s effort to seek preenforcement relief. Amici Br. 13. Even here on appeal, the court only finds Navegar satisfied by relying on a concession in the District’s brief. See Op. at 1141-42. Thus, both the district court and this court agree that, under Navegar, a plaintiffs standing depends on the affirmative actions of the prosecuting authorities. Our doctrine thereby enables the government to deprive a plaintiff of preenforcement standing simply by being silent or deliberately vague about its intentions. Unless declaratory relief is available, prosecutors can act strategically to protect criminal laws or arbitrary enforcement procedures from judicial review. That is essentially what happened here. The District avoided a judicial decision about the validity of its interpretation of LEOSA by withdrawing its warrant without throttling back the level of threat. Were we content to follow the Supreme Court’s doctrine, we would simply ask whether Ord’s current compliance with D.C. law has been effectively coerced by his reasonable fear that he would be prosecuted if he reentered D.C. with a firearm. See Medlmmune, 549 U.S. at 129, 127 S.Ct. 764. We would answer this question in the affirmative without being distracted by the District’s “evolving” litigation stratagems. See Op. at 1141-42.
*1153 It is long past time to recognize Navegáis flaws and articulate a preenforcement standing doctrine consistent with decades of Supreme Court precedent. There can be no valid jurisprudential rationale for prolonging error. Stare decisis is an enduring principle, but it was never intended to preserve mistakes, like an insect in amber, and prevent them from ever being corrected. To borrow a trope from Theodore Roosevelt: “Nine-tenths of wisdom consists in being wise in time.” In that spirit, I urge the court to rehear this appeal en banc and overrule Navegar.